# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| CAPITAL CONSULTING, LLC, | |
| Plaintiff, | Case No.: |
| vs. | _____ |
| PRESTIGE GLOBAL TRADING, LTD.; PETER BAKER; JAYAT PRAMOD KANETKAR; AND GUARANTEED INVESTIGATIONS, INC., | **Jury Trial Demanded** |
| Defendants. | |

## COMPLAINT

### BAKER & HOSTETLER LLP
*Counsel for Capital Consulting, LLC*

S. Derek Bauer
Georgia Bar No. 042537
dbauer@bakerlaw.com

Ian K. Byrnside
Georgia Bar No. 167521
ibyrnside@bakerlaw.com

Cody S. Wigington
Georgia Bar No. 653519
cwigington@bakerlaw.com

1170 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia 30309-7676
404.459.0050 (telephone) | 404.459.5734 (facsimile)

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ACTION. ....................................1

II.   PARTIES TO THIS ACTION........................................................................1

III.  ADDITIONAL INDIVIDUALS AND ENTITIES RELATED TO THIS
      ACTION. ....................................................................................................4

IV.   JURISDICTION AND VENUE. ....................................................................5

V.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS. ......................6

      A.    Origins of the SBLC Deal. ................................................................7

      B.    Capital enters into Purchase Agreement with PGT to obtain the
            SBLC. ................................................................................................8

      C.    Capital, Baker, and Kanetkar enter into Escrow Agreement. .............12

      D.    Wiring of Financial Fee to Kanetkar and release of funds to
            PGT and Baker. ................................................................................15

      E.    PGT and Baker's failure to provide SBLC and presentation of
            fraudulent documents. .......................................................................16

      F.    Colubris's investigation of PGT and Baker's fraudulent
            conduct. ...........................................................................................19

      G.    Kanetkar's abrogation of responsibility, and PGT and Baker's
            continued presentation of fraudulent documents. ...............................21

      H.    PGT and Baker promise to return funds paid into escrow
            account and honor rescission of Purchase Agreement........................24

      I.    Capital, PGT, and Baker reach a settlement agreement.......................28

      J.    Kanetkar, GII, Baker, and PGT's pattern of racketeering. .................29

            1.    Kanetkar's perpetration of scheme against Preadia.................29

i

# TABLE OF CONTENTS
## (continued)

**Page**

    2.    Scheme likely perpetrated against other victims. ....................35

VI.    CAUSES OF ACTION AND REQUESTS FOR RELIEF. .........................36

    A.    Cause of Action No. 1: Violation of 18 U.S.C. § 1962(c) (All Defendants). ........................................................................36

    B.    Cause of Action No. 2: Violation of 18 U.S.C. § 1962(d) (All Defendants). ........................................................................44

    C.    Cause of Action No. 3: Rescission of Purchase Agreement (PGT)................................................................................46

    D.    Cause of Action No. 4: Rescission of Escrow Agreement (Baker and Kanetkar). ...........................................................47

    E.    Cause of Action No. 5: Fraud (All Defendants). .................................48

    F.    Cause of Action No. 6: Money Had and Received (PGT and Baker). .......................................................................51

    G.    Cause of Action No. 7: Breach of Purchase Agreement (PGT). ........52

    H.    Cause of Action No. 8: Contractual Indemnification (PGT). .............54

    I.    Cause of Action No. 9: Breach of Escrow Agreement (Baker and Kanetkar). ...........................................................56

    J.    Cause of Action No. 10: Breach of Fiduciary Duty (Kanetkar). ........57

    K.    Cause of Action No. 11: Breach of Settlement Agreement (PGT and Baker). .....................................................................59

VII.    DEMAND FOR JURY TRIAL ....................................................61

VIII.    PRAYER FOR RELIEF. ...........................................................61

## I.   INTRODUCTION AND SUMMARY OF ACTION.

1.     Plaintiff Capital Consulting, LLC ("Capital") hereby asserts claims for violations of 18 U.S.C. § 1962(c) and (d), rescission of contract, fraud, money had and received, and breach of contract against Defendants Prestige Global Trading, Ltd. ("PGT"),[1] Peter J. Baker ("Baker"), Jayat Pramod Kanetkar, Esq. ("Kanetkar")[2], and Guaranteed Investigations, Inc. ("GII") (collectively, "Defendants"); and seeks compensatory damages, treble damages, interest, punitive damages, and its expenses of litigation (including attorneys' fees).

## II.   PARTIES TO THIS ACTION.

2.     Capital is a New Mexico limited liability company whose principal place of business is located at 530-B Harkle Road, Suite 100, Santa Fe, New Mexico 87505.   Capital entered into a business arrangement with Defendants whereby PGT and Baker promised to obtain and sell a standby letter of credit to Capital, and Kanetkar served as Capital's escrow agent and attorney for purposes of holding and releasing funds to PGT and Baker during the transaction (the "SBLC Deal"). Ultimately, however, Capital became the victim of Defendants'

---

[1] Capital also asserts a claim for contractual indemnification against PGT.

[2] Capital also asserts a claim for breach of fiduciary duty against Kanetkar.

1

fraudulent actions and, more broadly, the racketeering enterprise in which Defendants participated.

3.      PGT is a Georgia corporation whose principal place of business and registered agent is located at 1565 Great Oaks Dr., Lawrenceville, GA, 30045 in Gwinnett County, Georgia.   PGT is an entity capable of holding a legal or beneficial interest in property.   PGT perpetrated the unlawful acts described herein, upon information and belief, primarily from its principal place of business, and those unlawful acts affected interstate and foreign commerce.

4.      Baker is an individual citizen and resident of Georgia who, upon information and belief, can be found and served with this Complaint at 1565 Great Oaks Dr., Lawrenceville, GA, 30045. Baker serves as the registered agent, CEO, CFO, and Secretary of PGT, and directed PGT's actions during the SBLC Deal. Baker perpetrated the unlawful acts described herein, upon information and belief, from PGT's principal place of business, and those unlawful acts affected interstate and foreign commerce.

5.      Kanetkar is an attorney licensed to practice law in New Jersey who, upon information and belief, can be found and served with this Complaint at 1794 Oak Tree Road, Edison, New Jersey 08820.   Kantekar entered into an agreement with Capital to serve as its escrow agent and attorney for purposes of managing an

2

escrow account utilized in the SBLC Deal.  Kanetkar was principally responsible for holding funds on behalf of Capital in the escrow account until the SBLC Deal was complete and Capital instructed Kanetkar to release the funds to PGT and Baker.  Kanetkar, however, was a co-conspirator with PGT and Baker in the perpetration of the unlawful acts related to the SBLC Deal.  In addition, Kanetkar is, upon information and belief, one of the architects and managers of the ongoing racketeering enterprise which victimized Capital and others.

6.     GII is a New Jersey Corporation whose principal place of business is located at 1794 Oak Tree Road, Edison, New Jersey 08820.  GII is in the business of performing background investigations for mergers and acquisitions, assisting with asset recovery, and providing escrow agent services.  As such, GII is an entity capable of holding a legal or beneficial interest in property.  Kanetkar serves as the registered agent of GII, and is an employee and agent of GII.  GII knowingly authorized and acquiesced in Kanetkar's racketeering activity.  Specifically, GII approved Kanetkar's use of GII's corporate existence, bank account(s), and other resources to perpetuate the unlawful racketeering activity in which Kanetkar engaged while in GII's employ.  Furthermore, Kanetkar's conduct furthered GII's business and, as such, GII derived benefits from Kanetkar's racketeering activity.

## III.   ADDITIONAL INDIVIDUALS AND ENTITIES RELATED TO THIS ACTION.

7.     Miguel A. Bautista ("Bautista") is an individual citizen and resident of California and is the Managing Director of Capital.  Bautista was the primary Capital representative responsible for the SBLC Deal.  As such, Bautista interacted with the parties to this lawsuit and many of the additional persons and entities related to this action.

8.     Colubris Ventures Limited ("Colubris") is a United Kingdom Corporation with offices in the United States of America located at 6421 Stone Ridge Court, Kannapolis, North Carolina 28081 USA.   Colubris and Capital entered into a joint venture agreement to arrange the SBLC Deal.

9.     The Hongkong and Shanghai Banking Corporation Limited ("HSBC") located at 8 Canada Square, Canary Wharf, London, United Kingdom was chosen as the financial institution that would issue and financially back the standby letter of credit which PGT agreed to obtain and sell to Capital.

10.     Allied Sterling Ltd. ("Allied") and Colubris reached an agreement under which Colubris promised to provide collateral for lending against the standby letter of credit.

11.     Sino Rising Group, Ltd. ("SRG") was designated as the beneficiary of the standby letter of credit at the direction of Allied.

4

12.     DBS Bank Ltd. ("DBS") is the beneficiary bank to which PGT and Baker were required to deliver the standby letter of credit for use by SRG.

13.     Diversified Initiatives Consulting & Logistics, Inc. (the "Applicant") is, upon information and belief, a Florida based company which Baker routinely referred to as the Applicant.  Baker repeatedly contended that the Applicant was arranging the standby letter of credit issuance with HSBC as PGT's "partner."

## IV.     JURISDICTION AND VENUE.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. §§ 1964 and 1965 (jurisdiction and venue under Racketeering Influenced and Corrupt Organizations Act), and 28 U.S.C. § 1367 (supplemental jurisdiction).

15.     PGT is subject to the personal jurisdiction of this Court because it resides and does business in this district.

16.     Baker is subject to the personal jurisdiction of this Court because he resides and does business in this district.

17.     Kanetkar is subject to the personal jurisdiction of this Court under 18 U.S.C. § 1965(b) because, given the national and international reach of the racketeering enterprise, the ends of justice require that Kanetkar, as a co-

conspirator, manager, and participant in the racketeering enterprise, be brought before this Court.

18.    GII is subject to the personal jurisdiction of this Court under 18 U.S.C. § 1965(b) because, given the national and international reach of the racketeering enterprise, the ends of justice require that GII, as a co-conspirator and participant in the racketeering enterprise, be brought before this Court.

19.    Venue is appropriate in this district and division pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this district for this action, PGT and Baker reside in this district, and given the national and international reach of the racketeering enterprise, the ends of justice require that Kanetkar and GII, as co-conspirators and participants in the racketeering enterprise, be brought before this Court.

## V.    **FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS.**

20.    Defendants are participants in an enterprise that operates with the purpose of deceiving legitimate individuals and companies into agreements under which participants in the enterprise agree to obtain financial instruments, such as standby letters of credit, in exchange for payment of a large upfront fee into GII's escrow account in New Jersey (the "SBLC Enterprise").   The participants,

however, have no intention at the time of contracting of obtaining the financial instruments and simply seek to unlawfully obtain the upfront fee.

21.    Participants in the SBLC Enterprise, upon information and belief, operate in their individual capacities and through various entities established, at least in part, to carry on the unlawful acts.

22.    Capital fell prey to the racketeering activity of the SBLC Enterprise and four of its participants.   Capital is also aware of others that have been victimized by the SBLC Enterprise.

### A.    Origins of the SBLC Deal.

23.    Capital sought to diversify its portfolio by participating in funding against the issuance of certain bank instruments related to project financing, including standby letters of credit.

24.    Colubris shared Capital's strategy for diversifying its own portfolio. Accordingly, Capital and Colubris entered into a joint venture agreement on August 24, 2016 (the "Joint Venture Agreement").   Under the Joint Venture Agreement, Capital and Colubris agreed to jointly contribute capital and participate in the issuance of certain bank instruments, including standby letters of credit, that their clients would use for project financing.

25.   In furtherance of this diversification strategy, Colubris reached an agreement with Allied under which Colubris promised to provide collateral for lending against a standby letter of credit with a face value of €100,000,000 (the "SBLC").  As part of that agreement, Allied instructed Colubris to designate SRG as the beneficiary of the SBLC.

### B.   Capital enters into Purchase Agreement with PGT to obtain the SBLC.

26.   Capital also reached an agreement with PGT under which PGT promised to obtain issuance of the SBLC from HSBC or other financial institution(s) of comparable caliber to sell to Capital.   This agreement was memorialized    in    the    Purchase    Agreement,    Transaction    Code: PGT/HSBC/SBLC/€100M/082215 (the "Purchase Agreement"), which became effective on September 26, 2016.

27.   Under the Purchase Agreement, Capital "agree[d] to purchase from [PGT] the following financial bank instrument . . .:"

TERMS AND CONDITION AND DESCRIPTION OF FINANCIAL BANK INSTRUMENT:

| | | |
|---|---|---|
| 1. | INSTRUMENT: | STANDBY LETTER OF CREDIT (SBLC) |
| 2. | TYPE: | IRREVOCABLE |
| 3. | CONDITION: | (100.0%) ONE HUNDRED PERCENT CASH BACKED |
| 4. | TOTAL FACE VALUES: | €100,000,000 ONE HUNDRED MILLION EUROS |
| 5. | ISSUING BANK: | HSBC |
| 6. | REF.: | €100 M |
| 7. | I.S.I.N. /CUSIP NO.: | DETAILED UPON ISSUANCE |
| 8. | TERM: | ONE YEAR, ONE DAY  (366 DAYS) |
| 9. | PURCHASE PRICE: | TWENTY PERCENT (20,0%) OF FACE VALUE |
| 10. | FINANCIAL FEE: | €500,000 (DUE UPON CONTRACT ACCEPTANCE) |
| 11. | DELIVERY: | S.W.I.F.T. SYSTEM - MT-799 PRE-ADVICE, MT-760 DELIVERY |
| 12. | PAYMENT: | SWIFT MT103 TO COORDINATES AS DETAILED |
| 13. | COMMISSION: | ONE (1%) PERCENT OF FACE VALUE PAID BY BUYER |

8

(Exh. No. 1, Purchase Agreement, p. 3.)

28.    Capital also agreed "to pay [PGT] a financial fee for the issuance of the SBLC in the total amount of Five-Hundred-Thousand-Euros (€500,000 Euros) (the "Financial Fee") for the procurement of the SBLC." (Exh. No. 1, Purchase Agreement, Art. III, p. 6.)  Capital was required to wire payment of the Financial Fee to the designated escrow attorney, Kanetkar, after execution of the Purchase Agreement.  (Exh. No. 1, Purchase Agreement, Art. III, p. 6; Exh. No. 1, Purchase Agreement, Art. V, p. 8.)

29.    PGT represented that at the time of signing the Purchase Agreement it was "prepared to sell, remit, and deliver the full legal title transfer of [the] irrevocable SBLC." (Exh. No. 1, Purchase Agreement, Art. II, p. 5.)  In fact, PGT affirmed in the Purchase Agreement that it had "control of said SBLC and [it had] the capacity, ability and [was] ready to sell and transfer [it] to" Capital.  (Exh. No. 1, Purchase Agreement, Art. II, p. 5; *see also* Exh. No. 1, Purchase Agreement, Art. III, p. 6; Exh. No. 1, Purchase Agreement, Art. V, p. 8.)[3]

---

[3] PGT further represented and warranted in the Purchase Agreement that it was capable of obtaining the SBLC without engaging in fraudulent or criminal activity. PGT expressly represented and warranted that:

it ha[d] the ability and resources to arrange contracts and sources, with full corporate responsibility, financial bank instrument to be provided to [Capital]" and declared "under penalty of perjury that the subject

30.    The Purchase Agreement provided that the SBLC would be delivered to Capital's designated beneficiary, SRG, by the Society for Worldwide Interbank Financial Telecommunication ("S.W.I.F.T.") MT-760[4] process on or before October 26, 2016.  (Exh. No. 1, Purchase Agreement, Art. II, p. 5; Exh. No. 1, Purchase Agreement, Art. VI, p. 10.)   "[I]f by [October 26, 2016] the SBLC ha[d] not been delivered in accordance with the terms and conditions [of the Purchase Agreement], at such time, [Capital] may, at its discretion, elect to terminate the transaction and th[e] [Purchase] Agreement, and [PGT] shall be obligated to fully refund the Financ[ial] Fee, without deduction, recourse or offset."  (Exh. No. 1, Purchase Agreement, Art. VI, p. 10.)

31.    Any deviation from or failure to comply with the terms of the Purchase Agreement by PGT is a breach of contract which permits Capital to rescind and cancel the Purchase Agreement and requires PGT to return all funds,

---

financial bank instrument shall be wholly cashed backed by funds that are good, clean and free of criminal origin and that the same will be free and clear of all liens, encumbrances and third party interests.

(Exh. No. 1, Purchase Agreement, p. 2.)

[4] S.W.I.F.T. MT-760 is an electronic message that guarantees a bank will make payment in favor of a client of another bank. When a MT-760 is issued, the issuing bank puts a hold on its client's funds thereby ensuring that the funds are in place to make payment to the recipient of the S.W.I.F.T. MT-760.

including the Financial Fee, paid by Capital.  The Purchase Agreement specifically

provides:

> **Protocols.** Both [Capital and PGT] agree to the following terms and conditions for protocols:
>
> **Protocol One**. Other than circumstances out of the control of [PGT], any compromise, deviation from, and/or failure by [PGT] is, and will be, considered or constituted by [Capital] as a "breach of contract," which may result in the cancellation of the [Purchase] Agreement, and the forfeiture of any/all funds that have been paid to-date by [Capital], and applying of further additional fees, damages and/or charges relating to the consequences of such "breach of contract."
>
> **Protocol Two**. Furthermore, [PGT] is compromised and held accountable by way of th[e] executed [Purchase] Agreement, to follow-through and consummate the sale/transfer/assignment of all rights/title/interest in and delivery of the subject SBLC to [Capital]; as any compromise to the same, may constitute a failure-to-perform on behalf of [PGT]. In such case, [PGT] would refund any and all Financial Fee that has been contractually submitted, deposited or rendered by [Capital] and received, collected, processed, bypassed or held through [Kanetkar's] trust account.

(Exh. No. 1, Purchase Agreement, Art. V, pp. 9-10.)

32.     Under the Purchase Agreement, PGT agreed to indemnify Capital for

its losses due to PGT's intentional non-performance, conduct, and

misrepresentations.  Specifically, PGT agreed to the following indemnification

provision:

> **[PGT]'s Indemnification**.  [PGT] shall indemnify, defend and hold harmless [Capital] from any claim, allegation, indictment, action, liability, loss, suit, demand and/or damage whomsoever, including

11

attorneys' fees and costs, arising from the activities caused in whole or in part by any intentional, non-performance, conduct, obligation, misrepresentation or negligent act of [PGT], whether generated directly or indirectly or by any act or omission of anyone prior, during and/or after any business transaction and/or exercise of rights pursuant to any third party's involvement with [PGT].

(Exh. No. 1, Purchase Agreement, Art. IX, p. 12.)

33.    PGT also agreed to pay Capital's attorneys' fees for bringing this action by agreeing to the following provision in the Purchase Agreement:

**Attorneys' Fees**.    If any litigation, proceeding or arbitration is commenced to enforce any provision of this [Purchase] Agreement or to seek a declaration of the rights of any Party hereunder or as a result of any breach or threatened breach of any provision of this [Purchase] Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party all of its costs and expenses incurred in connection with such litigation, proceedings or arbitration, including without limitation, reasonable attorneys' fees.

(Exh. No. 1, Purchase Agreement, Art. XI, p. 16.)

### C.    Capital, Baker, and Kanetkar enter into Escrow Agreement.

34.    The Purchase Agreement required that Capital and PGT execute an escrow agreement for wiring of the Financial Fee to an escrow account. (Exh. No. 1, Purchase Agreement, p. 1; Exh. No. 1, Purchase Agreement, Art. III, p. 6.)

35.    However, Capital, Baker (not PGT), and Kanetkar entered into a written escrow agreement on September 23, 2016 (the "Escrow Agreement").  (*See*

*generally* Exh. No. 2, Escrow Agreement.)   The Escrow Agreement was a GII document and drafted on GII's letterhead.  (*Id*.)

36.    Pursuant to the Escrow Agreement, Kanetkar was appointed as Capital's escrow agent for purposes of facilitating the flow of funds from Capital to Baker under the direction and instruction of Capital.  (*See e.g.*, Exh. No. 2, Escrow Agreement, § 1, p. 1.)  While serving as Capital's escrow agent, Kanetkar was acting in his capacity as an agent for GII.

37.    Kanetkar, Capital, and Baker acknowledged that Kanetkar was also serving as Capital's attorney for purposes of managing the funds deposited in the escrow account and administering the Escrow Agreement.  (*See e.g.*, Exh. No. 2, Escrow Agreement, § 1, p. 1.)

38.    Under the Escrow Agreement, Capital was required to wire the Financial Fee to Kanetkar.  (*See* Exh. No. 2, Escrow Agreement, § 2, p. 1.)  The account designated by Kanetkar to accept the escrow funds was a Bank of America account held by GII.

39.    Without designating whether Kanetkar or GII was receiving such payment, the Escrow Agreement provided that "[f]ees for escrow services shall be one half of one point of (.005) of the value of each incoming wire transfer."  (*See* Exh. No. 2, Escrow Agreement, § 8, p. 3.)

13

40.     Baker was required to utilize the escrow funds for the sole purpose of facilitating the issuance, registration, and administration of a "fresh cut" SBLC with a face value of €100,000,000 in accordance with the Purchase Agreement. (*See* Exh. No. 2, Escrow Agreement, § 2, p. 1.)

41.     Kanetkar was required to abide by Capital's written instructions with regard to retention and disbursement of the Financial Fee.  Indeed, Sections 4 and 5 of the Escrow Agreement provide:

> 4. **Security**. [Kanetkar] shall hold the deposit money for the benefit of [Capital], and shall abide by all WRITTEN instructions provided by [Capital] for disbursement of the [Financial Fee] and subsequent funds.  All said WRITTEN instructions shall be followed as long as they do not violate any laws of the State of New Jersey and the laws of the United States. . .
>
> 5. **Reliance**. . .[Kanetkar] attests that he will comply with [Capital's] instructions, and shall safeguard said funds while in [Kanetkar's] custody pursuant to the laws of the State of New Jersey, and the rules and regulations set forth by the New Jersey Board of Bar Examiners and Attorney Ethics Committee.

(Exh. No. 2, Escrow Agreement, §§ 4-5, p. 2.)

42.     Under Section 2 of the Escrow Agreement, Baker promised to refund the Financial Fee to Capital if Baker failed to perform any provision of the Purchase Agreement or Escrow Agreement, "such as failure to deliver the SBLC via MT-760 to the agreed client designated account in a timely fashion [under the Purchase Agreement]."  (Exh. No. 2, Escrow Agreement, § 2, p. 1.)

14

43.    In the event of such non-performance, Kanetkar was required to "immediately initiate collection procedures on behalf of [Capital] and facilitate the return of [Capital's Financial Fee] at the full expense of [Baker]. (Exh. No. 2, Escrow Agreement, § 2, p. 1.)

### D.    <u>Wiring of Financial Fee to Kanetkar and release of funds to PGT and Baker.</u>

44.    Capital ensured the Financial Fee was wired to Kanetkar to be held in escrow.  In accord, Colubris, on behalf of Capital, wired $137,500 on October 3, 2016 and an additional $427,500 on October 11, 2016 to the GII account designated by Kanetkar.

45.    On October 4, 2016, Baker directed Capital to issue an email releasing the funds deposited in escrow on October 3, 2016 as a prerequisite to continuing with the transaction.  Baker represented the Applicant required upfront payment and neither the Applicant nor PGT would proceed without it.

46.    Accordingly, on written instruction from Capital on October 4, 2016, Kanetkar purportedly released $137,500 of the Financial Fee to PGT and Baker.

47.     To Capital's surprise, on October 13, 2016, Kanetkar requested confirmation from Capital that he is authorized to release the funds deposited in the escrow account on October 11, 2016.[5]

48.     Upon receiving Kanetkar's request, Capital contacted Baker to inquire about Kanetkar's request.  Baker again directed Capital to issue an email releasing funds deposited in the escrow account on October 11, 2016 as a prerequisite to continuing with the transaction.  Baker again represented that the Applicant required upfront payment of the Financial Fee and neither the Applicant nor PGT would proceed without it.

49.     Accordingly, on written instruction from Capital, Kanetkar purportedly released $427,500 of the Financial Fee to PGT and Baker.

### E.     PGT and Baker's failure to provide SBLC and presentation of fraudulent documents.

50.     On October 18, 2016, Baker emailed Capital a document purporting to be a bank guarantee that Baker claimed was issued by HSBC Holdings PLC and

---

[5] Simultaneously with a personal email address, Kanetkar used the GII email address  jkanetkar@guaranteedinvestigatonsinc.com  when communicating with Capital (and, upon information and belief, PGT and Baker) during the SBLC Deal. In addition, Kanetkar corresponded in formal letters with Capital (and, upon information and belief, PGT and Baker) using GII letterhead.

16

The Deposit Trust & Clearing Corporation ("DTCC").   The purported bank guarantee appeared to be signed by HSBC Holdings PLC bank officials.

51.    Capital notified Baker that PGT was required to obtain a SBLC under the Purchase Agreement and Escrow Agreement, not the bank guarantee Baker emailed.  In accord, Baker acknowledged that he sent the incorrect bank instrument and reaffirmed that PGT would obtain the requisite SBLC.

52.    Despite the error, Baker instructed Capital to provide DBS's banking coordinates so Baker could request the initiation of the S.W.I.F.T. MT-799[6] Pre-Advice in order to keep the transaction progressing.   Capital complied with Baker's instructions on October 18, 2016.

53.    On October 20, 2016, Baker emailed Capital a document he contended was the requisite SBLC.  Baker claimed the SBLC was issued by HSBC Holdings PLC and DTCC and signed by HSBC Holdings PLC bank officials.

54.    After reviewing the document, Capital questioned its integrity and notified Baker of its concerns.  Baker reaffirmed PGT's position that the SBLC was a valid and genuine SBLC issued by HSBC and further suggested that Capital

---

[6] S.W.I.F.T. MT-799 is an electronic message in which a banking institution confirms that funds are in place to cover a potential trade and to confirm transfers of funds.  In the transaction at issue, PGT was required to use the S.W.I.F.T. MT-799 Pre-Advice as a prerequisite to initiating the MT-760 process.

"go on screen" with a DTC screen or Euroclear screen to verify the validity of the SBLC.

55.    On October 21, 2016, Baker emailed Capital documents which he contended were Euroclear screenshots confirming the validity of the SBLC. However, the validity of the Euroclear screenshots was questionable because the interface depicted in the screenshots was discernably different than the interface then in use by the Euroclear system.

56.    On October 22, 2016, Capital confronted Baker regarding concerns that the transaction was falling through, and specifically expressed concerns about the apparent invalidity of the SBLC.  Baker maintained PGT's position that the SBLC was validly issued by HSBC, and further stated that once the S.W.I.F.T. MT-799 Pre-Advice was received, Baker would send additional confirmation that the SBLC was valid.

57.    Based on the significant concerns with the validity of the SBLC, Capital, on October 26, 2016, sent PGT a demand for full performance of the Purchase Agreement within 24 hours.

58.    In response, Baker represented on October 28, 2016 that PGT fully performed under the Purchase Agreement and the MT-799 Pre-Advice was delivered to DBS.  However, no such delivery was made.

18

59.     After receiving confirmation from Colubris, Capital notified PGT on October 31, 2016 that the MT-799 Pre-Advice was not delivered and no other message was received by DBS.  Baker denied the MT-799 Pre-Advice was not delivered and promised by text message to provide a receipt from HSBC confirming delivery.

**F.     Colubris's investigation of PGT and Baker's fraudulent conduct.**

60.     Throughout Capital's interactions with PGT and Baker, Capital communicated the status of the transaction and forwarded all documents to Colubris.

61.     Colubris reviewed the bank guarantee emailed by Baker on October 18, 2016 and observed several issues with the instrument that called into question the instrument's integrity, including non-uniform bank letterhead formatting, bank name misspellings, and digital copies of bank officer signatures.

62.     For similar reasons, Colubris questioned the integrity of the October 20, 2016 SBLC emailed by Baker.

63.     Upon receiving the October 21, 2016 Euroclear screenshots purportedly confirming the validity of the SBLC, Colubris's President and CEO, Brian Lillie, immediately identified the alleged Euroclear screenshots as fraudulent based on personal experience with the then current Euroclear interface.

64. Based on PGT and Baker's presentation of multiple questionable documents, Colubris undertook a thorough investigation in an effort to confirm the validity of the SBLC and the account from which it purportedly originated.

65. Colubris was advised in early November 2016 by Alison Cribbes in the compliance department at HSBC that the SBLC presented by Baker was not issued by HBSC, the account of origin did not exist, and HSBC had not issued any other financial instrument involving the parties to the transaction.  Ms. Cribbes also confirmed the S.W.I.F.T. transmission documents supplied by Baker were not prepared, issued, or sent by HSBC.  In fact, Ms. Cribbes indicated that the documents appeared to be in furtherance of fraudulent activity because, *inter alia*, the documents were not prepared in HSBC's standard format. Ms. Cribbes, accordingly, reported the situation to HSBC's Fraud and Risk Department for further investigation and possible action.

66. In addition, Colubris submitted the documents to Paul Kavanah, a member of HSBC's legal counsel team in the United Kingdom.  Mr. Kavanah confirmed the documents were likely fraudulent and also referred the matter to HSBC's Fraud and Risk Department.

67. On or about November 8, 2016, Colubris conferred with Allied, SRG, and DBS, respectively, to determine the validity of the S.W.I.F.T. transmission

confirmations.   After reviewing the S.W.I.F.T. transmission confirmations from Baker and their internal records, all three confirmed that no S.W.I.F.T. transmission concerning the transaction at issue had occurred.

68.   On November 14, 2016, Colubris informed Capital that Roy Rodriguez of the Financial Crimes Division of HSBC also concluded the documents provided by Baker were fraudulent and indicative of criminal conduct.

69.   In addition, Rob Hipwell, Senior Fraud Risk Manager of Global Fraud, Global Security & Fraud Risk of HSBC Group Management Services Limited, confirmed that the signatures on the documents provided by Baker were fraudulent, and the representatives who purportedly signed the documents did not have any knowledge of the transaction.

70.   Colubris sent correspondence to Capital on November 30, 2016 confirming that Allied and DBS had not received any communications through S.W.I.F.T. or any other means as of November 25, 2016.

## G.   Kanetkar's abrogation of responsibility, and PGT and Baker's continued presentation of fraudulent documents.

71.   As the fraudulent conduct of PGT and Baker persisted, Capital called on Kanetkar, as Capital's fiduciary for purposes of administering the escrow account, to honor his obligations under the Escrow Agreement.   Specifically, Capital demanded that Kanetkar return all funds paid into the escrow account, and,

if the funds were no longer in the escrow account, to retrieve the funds and return them to Capital.

72.   Capital first instructed Kanetkar to return all funds deposited into the escrow account on November 1, 2016.  At that time, Capital informed Kanetkar of Baker's presentation of fraudulent documents and failure to perform under the Purchase Agreement.   Kanetkar, however, refused to comply with Capital's instructions claiming Baker would present confirmation of performance, including proof that the S.W.I.F.T. transmission was delivered to DBS.

73.   Capital forwarded Colubris's correspondence concerning the results of its investigation to Baker and Kanetkar on November 9, 2016 and demanded they return the funds deposited in the escrow account.

74.   In response, Baker emailed Capital and Kanetkar copies of the documents it contended were S.W.I.F.T. MT-760 transmission confirmations to show the SBLC was sent to DBS and that PGT had fully performed.[7]  Kanetkar claimed the documentation was sufficient evidence of PGT's performance under

---

[7] Capital immediately forwarded the documents received from PGT to Colubris. Colubris again discovered multiple issues indicating the documents were fraudulent, including use of a BIC code of a bank unrelated to the transaction, formatting inconsistent with HSBC's standard formatting, unauthorized bank officers allegedly executing documents with electronic signatures, and an incomplete and invalid IBAN/account number of the issuing account.

the Purchase Agreement and refused to retrieve and return the escrow funds to Capital.

75.    Capital forwarded the November 10, 2016 correspondence from Colubris to Kanetkar explaining that Colubris's investigation confirmed Baker was presenting fraudulent documents.  Capital followed up the correspondence with a telephone call to Kanetkar.  During the conversation, Kanetkar acknowledged receipt of the correspondence from Colubris, but, despite the evidence that Baker was presenting fraudulent documents, Kanetkar refused to retrieve and return the funds paid into the escrow account.

76.    After receiving the November 14, 2016 report from Colubris that Mr. Rodriguez concluded the documents presented by Baker were fraudulent, Capital made another demand on Kanetkar to retrieve and return the escrow funds. Kanetkar, however, refused claiming the transaction was legitimate and instructed Capital to cease contacting him about the validity of the documents and direct all further correspondence on the issue to Baker.

77.    In a good faith attempt to verify that PGT was attempting to consummate the transaction, Capital requested that Baker provide documents sufficient to confirm progress was being made, including copies of correspondence between PGT, the Applicant, DBS, and PGT's HSBC contact that Baker claimed

to have in his possession.  Baker, however, refused to provide the documentation

claiming he and PGT were not authorized to provide the information and PGT was

not required to do so under the Purchase Agreement.

78.    On November 16, 2016, Capital sent another demand to Kanetkar and

directed Kanetkar to fulfill his fiduciary duty to return or facilitate the return of all

funds that were deposited in the escrow account.    Kanetkar, nevertheless,

continued to refuse to put forth a good faith effort to retrieve and return the funds

paid into the escrow account.

79.    Additionally, during the course of Capital's dispute with Kanetkar,

PGT, and Baker, it became apparent Kanetkar was disclosing his conversations

with Capital to Baker.  For example, on at least one occasion immediately after a

conversation between Capital and Kantekar concerning Baker's submission of

fraudulent documents, Baker called Capital and accused Capital of asserting false

allegations concerning the validity of the documents and PGT's contractual

performance.

**H.    PGT and Baker promise to return funds paid into escrow account and honor rescission of Purchase Agreement.**

80.    Capital, by written correspondence dated November 2, 2016, notified

PGT that it rescinded the Purchase Agreement and demanded that all funds paid

into escrow account be returned.   (Exh. No. 3, Letter from Capital's Miguel Bautista to Baker (November 2, 2016).)

81.    Despite Capital's rescission of the Purchase Agreement, PGT and Baker continued to provide fraudulent documents and false information concerning the status of the transaction.[8]

82.    Baker responded to Capital's rescission on November 3, 2016 by emailing Capital an alleged HSBC transmission receipt claiming to confirm the submission of a S.W.I.F.T. MT-799 Pre-Advice to DBS.  On November 4, 2016, Baker further responded by email stating "[d]elivery of the required MT799 was sent by HSBC and received by the beneficiary's bank (DBS, Singapore) on November 1, 2016."

83.    On November 6, 2016, Baker emailed Capital another purported copy of a S.W.I.F.T. MT-799 Pre-Advice to DBS, and further stated that DBS acknowledged and confirmed receipt of the S.W.I.F.T. MT-799 Pre-Advice from HSBC.

---

[8] Notably, Baker, from October 2016 to January 2017, repeatedly utilized email, text messaging, and telephone calls to send fraudulent financial instruments and other fraudulent documents to Capital, and to make false statements about the validity of the documents and the status of the SBLC Deal.  The particular communications described in this Complaint are merely representative of the large volume of wire communications utilized by Baker in perpetuation of the unlawful conduct.

84.     Despite continuing to present these fraudulent documents and contend that PGT was performing adequately under the Purchase Agreement, Baker surprisingly promised to fully refund the Financial Fee on November 9, 2016.

85.     On November 28, 2016, Baker represented by text message to Capital that PGT was working to "retrieve" the SBLC.  Baker further represented that once he determined the cause of the delayed SBLC issuance, PGT would honor the terms of the Purchase Agreement and return the Financial Fee to Capital.

86.     Baker stated in a telephone call on November 29, 2016 that the Applicant requested the return of the SBLC and the Applicant is in communication with SRG concerning the return of the SBLC.  Capital advised Baker that, according to SRG, SRG never had any communication with Baker, PGT, the Applicant, or their alleged HSBC contact.  Baker retorted that SRG was lying to Capital.

87.     The next day, Baker represented to Capital that DBS returned the SBLC to HSBC and that it was determined SRG was engaged in nefarious activity. Capital demanded that Baker provide the contact information for the SRG contact with which he or the Applicant had allegedly communicated, but Baker refused to provide the information.

88.     Capital requested a status update from Baker concerning the return of the Financial Fee on December 2, 2016.  In response, Baker represented by text message that he was awaiting confirmation that the Applicant had full control of the SBLC.

89.     Accordingly, Capital sent another demand to PGT and Baker on December 2, 2016 advising them that Capital and Colubris have confirmed that Baker's representations about the status of the transaction and the documents submitted were fraudulent, and demanding that PGT and Baker return the Financial Fee.  Baker responded on December 5, 2016 again claiming to have evidence that his representations were true and offering to provide contact information for representatives at DBS that can provide confirmation.

90.     Baker further responded by email on December 7, 2016 and stated "[t]he contracted bank instrument (SBLC) was registered and issued on November 9, 2016 under SBLC012815/HSBC/UK-15."  Baker further stated that the delay in transmitting the SBLC was the result of Capital's failure to obtain a modification of the Purchase Agreement for an alleged beneficiary change from Allied to SRG.

91.     However, Baker's assertion is clearly contrary to the express terms of the Purchase Agreement because SRG was listed in the Purchase Agreement as the beneficiary.

27

92.     Capital responded to Baker's December 7, 2016 correspondence by simply demanding return of the Financial Fee.  As a result of the SBLC Enterprise's unlawful acts, in particular PGT's failure to obtain and sell the SBLC to Capital, Capital was unable to deliver the SBLC to SRG and meet its other obligations to Colubris.

## I.     **Capital, PGT, and Baker reach a settlement agreement.**

93.     As of the filing of this action, the SBLC has not been issued by HSBC or delivered by PGT.

94.     Although PGT and Baker deny that the SBLC was never issued by HSBC or delivered by PGT to SRG; Capital, PGT, and Baker ultimately entered into a written agreement for PGT and Baker to refund the Financial Fee to Capital and to fully and finally resolve all disputes and claims between them related to the Purchase Agreement and the Escrow Agreement (the "Settlement Agreement"). (*See generally* Exh. No. 4, Settlement Agreement.)

95.     In accordance with the Settlement Agreement, PGT and Baker agreed to pay Capital $561,000 in one lump sum representing the Financial Fee on or before January 30, 2017.

96.     PGT and Baker agreed to be jointly and severally liable for the payment. (Exh. No. 4, Settlement Agreement, Sec. 1, p. 2.)

28

97.    However, to date, neither PGT nor Baker have made any payment in accordance with the Settlement Agreement.

**J.    Kanetkar, GII, Baker, and PGT's pattern of racketeering.**

98.    The scheme perpetrated by Defendants against Capital is not an isolated incident.  Rather, upon information and belief, Kanetkar is an architect of the SBLC Enterprise and utilizes this scheme to defraud legitimate individuals and companies of substantial amounts of money.  GII, PGT, and Baker, among others, are involved in this scheme having, upon information and belief, perpetrated this scheme against other legitimate businesses at the direction of Kanetkar and/or Kanetkar's colleagues.[9]

*1.    Kanetkar and GII's perpetration of scheme against Preadia.*

99.    Upon information and belief, in 2015 and 2016, Kanetkar and GII, in concert with other participants in the SBLC Enterprise, perpetrated substantially the same scheme against Gaurave Srivastava ("Srivastava") and his companies, Veecon Biotech, LLC; Preadia Holdings, LLC; and Preadia, LLC (collectively, "Preadia").

---

[9] At least once during the SBLC Deal, Baker informed Capital that PGT and Baker were "working on other transactions at the same time."

100.   In August 2015, Veecon Biotech, LLC, entered into a Sales Agency Agreement ("Agency Agreement") with 2020cg, LLC, a Utah-based company operated by Daniel B. Kass ("Kass"), Jerrid Douglas ("Douglas"), and Joseph Lake ("Lake").  Under the Agency Agreement, 2020cg, LLC promised to "facilitate and expedite Veecon Biotech, LLC's vision and help it execute on its business plan."[10]

101.   Douglas was previously registered as a broker-dealer with the Financial Industry Regulation Authority ("FINRA").  Srivastava later discovered, however, that Douglas allowed his registration to lapse after having been suspended.

102.   On April 5, 2016, Preadia, at the behest of 2020cg's principals Douglas and Kass, entered into a "Binding Term Sheet" ("Term Sheet") with Grupo Mundial Balboa Internacional S.A. ("GMB") in the hopes of obtaining a significant amount of financing.  (*See generally* Exh. No. 5, GMB Binding Term Sheet.)  GMB promised to provide Preadia with a standby letter of credit in the amount of $100,000,000 in exchange for stock in Preadia.  (Exh. No. 5, GMB Binding Term Sheet, p. 1.)  Before receiving the standby letter of credit, however,

---

[10]   Upon information and belief, the negotiation, execution, and purported performance of the Agency Agreement occurred through email, text messages, and telephone calls.

Preadia had to pay $1,000,000 into an escrow account held by GII and Kanetkar. (Exh. No. 5, GMB Binding Term Sheet, p. 1.)[11]

103.   The parties to the Term Sheet and Kanetkar sometimes referred to this arrangement as the "Preadia-GMB transaction."

104.   During a meeting with Jim Adkins ("Adkins"), CEO of GMB and GMB's signator on the Term Sheet, in New York, New York, Adkins introduced Srivastava to Baker. Baker and Adkins informed Srivastava that Adkins and Baker knew each other and had worked together on other transactions.

105.   Shortly after Preadia signed the Term Sheet, Douglas and Kass started sending Srivastava harassing text messages, demanding that he wire the $1,000,000 to Kanetkar.  Douglas wrote to Srivastava: "Take a cashier['s] check to B[ank] O[f] A[merica] and deposit it in Jay's account."  Douglas added:  "People end up in ugly lawsuits over this stuff."  Douglas piled on, saying "Jim [Adkins] will sue if you don't move the money…for sure," and "send $500k to escrow account and close transaction."

106.   This constant barrage of text messages and repeated threats caused Srivastava to feel as if he had no choice but to send the money.

---

[11]   Upon information and belief, the negotiation, execution, and purported performance of the Term Sheet occurred through email, text messages, and telephone calls.

107.   During a telephone call, Kanetkar instructed Srivastava to wire the money to a Bank of America account held by GII.  Accordingly, Srivastava wired $250,000 on April 20, 2016 to the GII account as instructed by Kanetkar.

108.   Four days later, after numerous demands by Kass, Douglas, and Adkins, Srivastava was presented with and signed a letter entitled "Preadia Escrow Release Authorization" (the "Release"), and, at the direction of Douglas, emailed the Release to Kanetkar.   The Release purportedly authorized Kanetkar to immediately release the $250,000 to GMB and allowed GMB to use the funds at its "sole discretion."

109.   On May 29, 2016, Adkins sent Srivastava a "Breach of Contract Notice" (the "Notice").  In the Notice, Adkins claimed that Preadia had breached the Term Sheet by "fail[ing] to escrow ($1,000,000 USD) One Million USD on or before Friday, April 8, 2016…" and by "fail[ing] to escrow the remaining unpaid balance of ($750,000) Seven Hundred Fifty Thousand USD on or before Wednesday 11, 2016 [sic]…"  Adkins further threatened Srivastava with "civil and criminal action."

110. After receiving the Notice, Srivastava realized the Preadia-GMB transaction was likely a scam.[12] Accordingly, Srivastava demanded a refund of the $250,000 from Douglas. Douglas, however, refused to return Preadia's money, claiming that it "was used by GMB towards getting transactions done."

111. On June 26, 2016, Douglas sent a harassing letter to Preadia's shareholders, members, directors, and officers in which he falsely accused Srivastava of misappropriating Preadia's funds. He attached to the letter Preadia's checking account records; the Term Sheet; a deposit receipt from a third party; print outs of text messages between Kass, Douglas, and Srivastava; and the Notice.

112. Douglas informed the shareholders, members, directors, and officers that "as a direct result of [Srivastava's] gross misrepresentations, GMB may pursue legal remedy to enforce the [Term Sheet] and/or seek damages…."

113. Douglas also "urge[d]" Preadia's shareholders, members, directors, and officers to "create an action plan to resolve all outstanding issues," which

---

[12] In addition, the principals of 2020cg, LLC deceived Srivastava on multiple occasions throughout 2015 and 2016. For example, Douglas informed Srivastava that an investor, Bob Williams, was willing to invest $8,000,000 in Preadia, but to facilitate the transaction, Douglas would need access to Preadia's bank accounts. Srivastava gave Douglas the requested access but Douglas never delivered the $8,000,000 investment. Separately, Srivastava issued a $5,000 loan to Lake with repayment required in 90 days. Lake, however, has made no payments on the loan and has not provided any reason for his default.

would include, according to Douglas, transferring the remaining $750,000 to GMB.

114.   Douglas, Kass, and/or Lake also sent this harassing letter to people who were not Preadia's shareholders, members, directors, and officers, including current and potential business partners of Preadia.

115.   Srivastava eventually determined that Douglas has an interest in GMB and Brilliant Petroleum Company, a subsidiary of GMB.  Specifically, Douglas is a partner and the Chief Financial Officer of both entities.

116.   Srivastava ultimately retained legal counsel through which he repeatedly demanded repayment of Preadia's $250,000 from Douglas and Adkins.

117.   To date, Douglas and Adkins have not responded to the demands sent by Srivastava's counsel.  However, Kanetkar, on behalf of Douglas and Adkins, informed Srivastava's counsel by email on September 2, 2016 that "Mr. Douglas, Mr. Adkins, et al. will be responding…via their own legal counsel."[13]

118.   Upon information and belief, Kanetkar procured the additional $750,000 through a series of wire transfers from Raj Patel and Inn Boutique

---

[13] Kanetkar's September 2, 2016 email transmitted a formal letter on GII letterhead and stated "[a]ll work conducted [for the Preadia-GMB transaction] was performed under my company[,] Guaranteed Investigations, Inc., which all parties were aware of at the onset."

Distributors on April 28 and 29.  Upon information and belief, these wire transfers resulted in the deposit of the $750,000 into a Bank of America account held by GII.

119.   Srivastava and Preadia are not associated with Patel or Inn Boutique Distributors, and have no knowledge of their involvement with the Preadia-GMB transaction.

120.   Kanetkar, upon information and belief, wired one million dollars from the GII account, including the $250,000 paid by Preadia, to Roy Gillar and Gillar Worldwide Group Limited on May 3, 2016.  Upon further information and belief, Kanetkar or GII received compensation for conducting these transfers.

### 2.   *Scheme likely perpetrated against other victims.*

121.   Upon information and belief, the SBLC Enterprise (including Kanetkar, GII, PGT, Baker, and others) is perpetrating its scheme against individuals and companies around the United States.

122.   Capital has received information that other individuals and companies have entered into substantially similar business arrangements for obtaining access to capital.  The individuals and companies purporting to provide the access to capital have required advanced deposits of substantial sums of money through wire

transfers and presented fraudulent documents by email in perpetuation of the scheme.

123.   Upon information and belief, the discovery process will reveal the identity of additional victims and the details surrounding those particular victims' circumstances.

## VI.   CAUSES OF ACTION AND REQUESTS FOR RELIEF.

124.   Some of the causes of action and requests for relief set forth below are alleged alternatively under Fed. R. Civ. P. 8.

### A.   Cause of Action No. 1: Violation of 18 U.S.C. § 1962(c) (All Defendants).

125.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

### *The SBLC Enterprise*.

126.   The SBLC Enterprise is an enterprise engaged in and whose activities affect interstate and foreign commerce, and Defendants participate in and are associated with the SBLC Enterprise.

127.   The SBLC Enterprise operates with the purpose of reaching sham agreements with legitimate individuals and companies under which participants in the enterprise agree to obtain financial instruments, such as standby letters of

credit, in exchange for payment of large upfront fees into Kanetkar and GII's escrow account.

128.   If a victim delays or refuses to remit full payment of the upfront fee, participants engage in extortionate conduct to intentionally coerce payment. After obtaining payment, the participants perpetuate the scheme by using email and text messaging to present fraudulent financial instruments, knowingly making false statements concerning the validity of the financial instruments, and knowingly making false statements about the status of the transaction.

129.   Participants in the enterprise, upon information and belief, operate through and in conjunction with various entities established, at least in part, for carrying on the unlawful acts of the SBLC Enterprise.  As such, participants in the SBLC Enterprise willfully and knowingly agreed to participate in the scheme, to utilize Kanetkar and GII's fraudulent escrow services, and to take direction from Kanetkar and other managers of the enterprise.

130.   Upon information and belief, the SBLC Enterprise has actively pursued its purpose and defrauded individuals and businesses since at least 2015. Specifically, Kanetkar has participated in and, upon information and belief, directed the actions of other participants in the SBLC Enterprise since 2015.

131.   The longevity of the enterprise has permitted the participants to actively pursue the SBLC Enterprise's purpose.

132.   In addition, there is a substantial threat that the SBLC Enterprise will continue to pursue its purpose and victimize other individuals and entities.

*Predicate racketeering acts*.

133.   Pursuant to and in furtherance of their fraudulent scheme, Defendants and other participants committed multiple related acts of racketeering in violation of state and federal law, including 18 U.S.C. § 1961 *et seq*.  These acts include:

- wire fraud in violation of 18 U.S.C. § 1341;

- interference with commerce by threats in violation of 18 U.S.C. § 1951;

- extortion in violation of O.C.G.A. § 16-8-16, California Penal Code §§ 518-527, and other state extortion laws;

- laundering of monetary instruments in violation of 18 U.S.C. § 1956; and

- aiding and abetting in the perpetration of the enterprise's unlawful acts, and authorizing and acquiescing in racketeering.

134.   **Wire Fraud in violation of 18 U.S.C. § 1341**. Defendants, their co-conspirators, and others participating in the SBLC Enterprise knowingly and willfully participated in the enterprise's scheme with specific intent to defraud Capital and the other victims.  In furtherance of the scheme, Defendants and others

in the SBLC Enterprise repeatedly used and knowingly caused to be used interstate wire communications (including wire transfers of money, email communications, text messaging, and telephone communications) to effectuate the SBLC Enterprise's purpose of defrauding Capital and others.

135. Defendants used and caused to be used interstate wire communications to obtain possession of the Financial Fee, to transmit the Financial Fee (upon information and belief) to other participants in the SBLC Enterprise, and to perpetuate the unlawful conduct of the SBLC Enterprise by communicating with Capital and other participants in the SBLC Enterprise through email, text messaging, and telephone calls.

136. Defendants sent fraudulent financial instruments, fraudulent confirmations of electronic transfers of financial instruments, false representations concerning the validity of the fraudulent financial instruments, and misrepresentations about the status of the SBLC Deal and the actions being taken to complete the SBLC Deal.

137. Kanetkar and other participants in the SBLC Enterprise used and caused to be used interstate wire communications in the same manner to perpetrate the enterprise's unlawful scheme on Srivastava and Preadia, and, upon information and belief, others which will likely be identified in discovery.

138.  **Interference with commerce by threats (18 U.S.C. § 1951)**.  The
SBLC Enterprise's scheme included intentionally coercing their victims through
extortionate means into paying substantial amounts of money in upfront fees by
threating various actions and instilling fear in their victims in violation of 18
U.S.C. § 1951.

139.  Participants in the SBLC Enterprise knowingly and willfully took
$250,000 from Preadia by sending a barrage of threatening messages to Srivastava
threatening lawsuits, threatening Srivastava with "civil and criminal action,"
sending a harassing letter to Preadia's shareholders, members, directors, officers,
and others outside of the Preadia management falsely accusing Srivastava of
misappropriating Preadia's funds, and impliedly encouraging Preadia owners and
management to terminate Srivastava.

140.  Participants in the SBLC Enterprise perpetrated these extortionate acts
against Srivastava and Preadia with the intent to extort Srivastava and Preadia and
induce fear in them.

141.  By extorting the $250,000 from Preadia and failing to consummate
the Preadia-GMB transaction, The SBLC Enterprise's actions obstructed and
otherwise affected interstate and foreign commerce.

142.   Upon information and belief, Kanetkar was aware of and ratified the barrage of threats thrust upon Preadia and Srivastava at or near the time the threats were made.

143.   **Extortion (California Penal Code §§ 518-527, O.C.G.A. § 16-8-16, and other state extortion laws)**. The SBLC Enterprise's scheme of coercing their victims through extortionate means into paying substantial amounts of money in upfront fees by threating various actions and instilling fear in their victims also violated state extortion laws, including California Penal Code §§ 518-527 and O.C.G.A. § 16-8-16.

144.   The SBLC Enterprise, in particular Kanetkar, Douglas, and Kass, obtained $250,000 from Preadia, with Srivastava's consent, by inducing such consent with the wrongful use of force and fear in violation of state extortion laws. Specifically, participants in the SBLC Enterprise knowingly and willfully took $250,000 from Preadia by sending a barrage of threatening messages to Srivastava threatening lawsuits, threatening Srivastava with "civil and criminal action," sending a harassing letter to Preadia's shareholders, members, directors, officers, and others outside of the Preadia management falsely accusing Srivastava of misappropriating Preadia's funds, and impliedly encouraging Preadia owners and management to terminate Srivastava.

41

145.   In addition, participants in the SBLC Enterprise obtained Srivastava's signature on the Release under the duress of the above referenced threats.  Upon information and belief, Kanetkar subsequently submitted the Release to the bank maintaining his escrow account.

146.   Upon information and belief, Kanetkar was aware of and ratified the barrage of threats thrust upon Preadia and Srivastava at or near the time the threats were made.

147.   **Laundering of monetary instruments (18 U.S.C. § 1956)**. Upon information and belief, the SBLC Enterprise, Kanetkar in particular, violated 18 U.S.C. § 1956 by wiring funds unlawfully obtained from victims of the SBLC Enterprise's scheme to others, including Roy Gillar and Gillar Worldwide Group Limited, to conceal and promote the unlawful scheme.

148.   Kanetkar, and the other participants in the SBLC Enterprise, upon information and belief, (i) knew at the time of wiring the funds to others that the funds involved represented proceeds from unlawful activity, (ii) knew that the wire transfer was designed in whole or in part to conceal or disguise the nature, source, location, ownership, or control of those proceeds, and (iii) either intended or knew the wiring of funds was designed to promote underlying unlawful activity.

149. **Aiding, abetting, authorizing, and acquiescing**. Defendants have managed, operated, participated in, and aided and abetted the unlawful activities of the SBLC Enterprise.

150. Defendants were respectively aware of their roles in the SBLC Enterprise at the time they committed the unlawful acts described in this Complaint, and they knowingly and substantially assisted in perpetuating the SBLC Enterprise's purpose and in the commission of the unlawful acts.

151. Moreover, in addition to knowingly participating in, aiding and abetting, and perpetuating the SBLC Enterprise's racketeering activity, GII knowingly authorized and acquiesced in Kanetkar's racketeering activity. Specifically, GII approved Kanetkar's use of GII's corporate existence, bank account(s), and other resources to perpetuate the unlawful racketeering activity in which Kanetkar engaged while in GII's employ. Kanetkar's conduct furthered GII's business and, as such, GII derived benefits from Kanetkar's racketeering activity. Accordingly, GII should be held liable directly and under the doctrine of *respondeat superior*.

### *Pattern of racketeering*.

152. The racketeering acts described above constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5). Defendants agreed to, directly and

43

indirectly conducted, and participated in the conduct of the SBLC Enterprise's affairs through the pattern of racketeering activity described in this Complaint and for the unlawful purpose of intentionally defrauding Capital and others in violation of 18 U.S.C. § 1962(c).

*Injury proximately caused by racketeering*.

153.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Capital has been injured in its business and property, including, but not limited to, the amount of the Financial Fee, lost business opportunities, the impairment of Capital's interests in executed contracts, damaged business relationships, damaged reputation and goodwill, expenses of litigation (including attorneys' fees), and other amounts to be proven at trial.

154.    In addition, Capital is entitled to recover treble damages plus costs and attorneys' fees under 18 U.S.C. § 1964(c).

**B.    Cause of Action No. 2: Violation of 18 U.S.C. § 1962(d) (All Defendants).**

155.    Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

156.    Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Defendants respectively agreed to facilitate the operation of the SBLC Enterprise

through a pattern of racketeering activity, and knowingly agreed to facilitate the SBLC Enterprise's scheme by committing racketeering acts themselves, facilitating the commission of racketeering acts by other participants in the SBLC Enterprise, and ratifying the commission of such racketeering acts by other participants.

157. Defendants intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. Defendants knew their racketeering acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the SBLC Enterprise's scheme. Such conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c) and, in turn, violates 18 U.S.C. § 1962(d).

158.  As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Capital has been injured in its business and property, including, but not limited to, the amount of the Financial Fee, lost business opportunities, the impairment of Capital's interests in executed contracts, damaged business relationships, damaged reputation and goodwill, expenses of litigation (including attorneys' fees), and other amounts to be proven at trial.

159.   In addition, Capital is entitled to recover treble damages plus costs and attorneys' fees under 18 U.S.C. § 1964(c).

**C.    Cause of Action No. 3: Rescission of Purchase Agreement (PGT).**

160.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

161.   PGT and Baker fraudulently induced Capital into agreeing to the Purchase Agreement by promising to obtain and deliver the SBLC without the then present intent to perform PGT's obligations under the agreement.

162.   The Purchase Agreement provides that Capital may rescind the contract upon any deviation from or failure to comply with the terms of the Purchase Agreement by PGT.  (Exh. No. 1, Purchase Agreement, Art. V, pp. 9-10.) In addition, the law permits a claimant to rescind a contract that was procured through a defendant's fraud.

163.   Capital, upon discovering PGT and Baker's intentional non-performance and fraudulent conduct, rescinded the Purchase Agreement.  (Exh. No. 3, Letter from Capital's Miguel Bautista to Baker (November 2, 2016).)

164.   Accordingly, Capital is entitled to a court order declaring the Purchase Agreement was fraudulently induced, the Purchase Agreement is void and

unenforceable, and Capital definitively and timely rescinded and repudiated the Purchase Agreement.

**D.    Cause of Action No. 4: Rescission of Escrow Agreement (Baker and Kanetkar).**

165.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

166.   Baker, in concert with Kanetkar, fraudulently induced Capital into agreeing to the Escrow Agreement by promising to obtain and deliver the SBLC, promising to refund the Financial Fee if PGT and Baker failed to perform, and securing Kanetkar's fraudulent promise to serve as Capital's fiduciary over the funds without the then present intent to honor the promises.

167.   The law permits a claimant to rescind a contract that was procured through a defendant's fraud.

168.   Capital, upon discovering Baker and Kanetkar's non-performance and fraudulent conduct, rescinded the Escrow Agreement.

169.   Accordingly, Capital is entitled to a court order declaring the Escrow Agreement was fraudulently induced, the Escrow Agreement is void and unenforceable, and Capital definitively and timely rescinded and repudiated the Escrow Agreement.

### E.   Cause of Action No. 5: Fraud (All Defendants).

170.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

171.   PGT and Baker repeatedly represented during the course of negotiating the Purchase Agreement and through provisions in the Purchase Agreement that they had the capability of delivering and would deliver the SBLC on or before October 26, 2016.  In fact, PGT represented that it had "control of said SBLC" and that it had "the capacity, ability, and [was] ready to sell and transfer" the SBLC to Capital at the time the Purchase Agreement was signed.  (Exh. No. 1, Purchase Agreement, Art. II, p. 5.)

172.   However, PGT and Baker did not have control of the SBLC at the time the Purchase Agreement was signed, and, upon information and belief, did not have the capability of obtaining it.

173.   In addition, PGT and Baker made the representations that they would obtain and deliver the SBLC on or before October 26, 2016 with knowledge that they had no intention of ever obtaining and delivering the SBLC.

174.   After the Financial Fee was wired to GII's escrow account on the instruction of Kanetkar, PGT and Baker also represented that they needed the

escrow funds released because the Applicant required payment prior to securing the SBLC.

175.   PGT and Baker's representations concerning the need to release the escrow funds, however, were false, and, upon information and belief, PGT and Baker were not even attempting to obtain the SBLC.

176.   Throughout the course of dealings, PGT and Baker repeatedly made false statements about the status of the SBLC Deal and presented fraudulent documents, often times including forged signatures, with intent to deceive Capital.

177.   PGT and Baker made those misrepresentations and presented the fraudulent documents knowing the representations were false and the documents were fraudulent.

178.   PGT and Baker made all of the misrepresentations described in this Complaint with the intent to induce Capital into agreeing to the Purchase Agreement, depositing the Financial Fee into GII's escrow account, obtaining a release of the Financial Fee from escrow, and concealing their fraudulent conduct.

179.   PGT and Baker knew at the time of making the misrepresentations that Capital would justifiably rely on PGT and Baker's promises to perform.

180.   Capital justifiably relied on PGT and Baker's misrepresentations to its detriment by, *inter alia*, agreeing to the Purchase Agreement, depositing the

Financial Fee into GII's escrow account, and instructing Kanetkar to release the funds from escrow.

181.   Kanetkar and GII were co-conspirators in the perpetration of fraud against Capital.  Specifically, Kanetkar, upon information and belief, is one of the architects and managers of the scheme utilized to defraud Capital.   As such, Kanetkar was aware (individually and as an agent of GII) that PGT and Baker: (i) agreed to the Purchase Agreement with no intent to perform under the agreement, (ii) made false representations concerning the status of the SBLC Deal and the steps PGT and Baker were allegedly taking to consummate the SBLC Deal; and (iii) presenting fraudulent documents in an attempt to deceive Capital.

182.   Defendants' fraudulent conduct caused Capital monetary damages, including, but not limited to, the amount of the Financial Fee, lost business opportunities, the impairment of Capital's interests in executed contracts, damaged business relationships, damaged reputation and goodwill, expenses of litigation (including attorneys' fees), and other amounts to be proven at trial.

183.   Defendants have acted in bad faith, been stubbornly litigious, and caused Capital unnecessary trouble and expense during the entire course of events described in this Complaint.   Accordingly, Defendants are liable for Capital's expenses of litigation, including attorneys' fees, under O.C.G.A. § 13-6-11.

184.   While engaging in the fraudulent conduct, Defendants exhibited willful misconduct, malice, fraud, wantonness, oppression, and such an entire want of care that the presumption is raised that they possessed a conscious indifference to the consequences of their conduct.  In addition, Defendant's actions establish that they acted with specific intent to harm Capital.  Accordingly, Defendants are liable to Capital for punitive damages under O.C.G.A. § 51-12-5.1, the amount of which should be decided by a jury.

### F.   Cause of Action No. 6: Money Had and Received (All Defendants).

185.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

186.   Colubris, on Capital's behalf, paid $565,000 into the escrow account managed by Kantekar.

187.   Capital is the true owner of the funds paid into the escrow account.

188.   PGT and Baker, in concert with Kanetkar and GII, procured the release of funds paid into the escrow account through fraudulent means.  As such, PGT and Baker were not entitled to the funds at the time they procured the funds.

189.   As a result, PGT and Baker are not entitled, in good conscience, to retain the funds and are, consequently, obligated by the ties of natural justice and equity to refund the funds to Capital.

51

190.   Capital made numerous demands on Defendants to return the funds to Capital, but Defendants have steadfastly refused to return the funds and confirmed their continued intent to withhold payment through their conduct.

191.   Therefore, Capital is entitled to judgment against Defendants in the liquidated amount of $565,000 less any amounts previously refunded.

192.   In addition, Defendants have acted in bad faith, been stubbornly litigious, and caused Capital unnecessary trouble and expense during the entire course of events described in this Complaint.   Accordingly, Defendants are liable for Capital's expenses of litigation, including attorneys' fees, under O.C.G.A. § 13-6-11.

### G.   Cause of Action No. 7: Breach of Purchase Agreement (PGT).

193.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

194.   The Purchase Agreement is a valid contract to which Capital and PGT mutually assented.   Under the Purchase Agreement, PGT promised to obtain issuance of the SBLC from HSBC or other financial institution(s) of comparable caliber to sell to Capital. In exchange for PGT's promise and performance, Capital agreed to purchase the SBLC from PGT and pay the Financial Fee.

195.   The Purchase Agreement provided that the transaction would be delivered and confirmed to Capital's designated beneficiary, SRG, by the S.W.I.F.T. MT-760 process to SRG's bank, DBS, on or before October 26, 2016. (Exh. No. 1, Purchase Agreement, Art. II, p. 5; Exh. No. 1, Purchase Agreement, Art. VI, p. 10.)

196.   Any deviation from or failure to comply with the terms of the Purchase Agreement by PGT is a breach of contract which requires PGT to return all funds, including the Financial Fee, paid by Capital.   (Exh. No. 1, Purchase Agreement, Art. V, pp. 9-10.)

197.   Capital paid the requisite Financial Fee in accordance with the Purchase Agreement.   However, PGT breached the Purchase Agreement because it never obtained the SBLC or delivered it in accordance with the Purchase Agreement.

198.   Consequently, Capital has suffered a liquidated amount of damages in the amount of $565,000 (less any amounts previously refunded) as a result of PGT's breach of the Purchase Agreement.   Capital is, therefore, entitled to a judgment against PGT for $565,000 less any amounts previously refunded.

199.   In addition, Capital is entitled to an award of its expenses of litigation, including attorneys' fees under the Purchase Agreement and O.C.G.A. § 13-6-11.

200.   First, the Purchase Agreement provides:

**Attorneys' Fees**.   If any litigation, proceeding or arbitration is commenced to enforce any provision of this [Purchase] Agreement or to seek a declaration of the rights of any Party hereunder or as a result of any breach or threatened breach of any provision of this [Purchase] Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party all of its costs and expenses incurred in connection with such litigation, proceedings or arbitration, including without limitation, reasonable attorneys' fees.

(Exh. No. 1, Purchase Agreement, Art. XI, p. 16.)  Accordingly, PGT is liable for Capital's expenses of litigation, including attorneys' fees, under the Purchase Agreement.

201.   Second, PGT has acted in bad faith, been stubbornly litigious, and caused Capital unnecessary trouble and expense during the entire course of events described in this Complaint.  Accordingly, PGT is liable for Capital's expenses of litigation, including attorneys' fees under O.C.G.A. § 13-6-11.

## H.   Cause of Action No. 8: Contractual Indemnification (PGT).

202.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

203.   PGT agreed to indemnify Capital for its losses due to PGT's non-performance under the Purchase Agreement.   Specifically, PGT agreed to the following indemnification provision:

54

> **[PGT]'s Indemnification**.  [PGT] shall indemnify, defend and hold harmless [Capital] from any claim, allegation, indictment, action, liability, loss, suit, demand and/or damage whomsoever, including attorneys' fees and costs, arising from the activities caused in whole or in part by any intentional, non-performance, conduct, obligation, misrepresentation or negligent act of [PGT], whether generated directly or indirectly or by any act or omission of anyone prior, during and/or after any business transaction and/or exercise of rights pursuant to any third party's involvement with [PGT].

(Exh. No. 1, Purchase Agreement, Art. IX, p. 12.)

204.   As a result of the PGT's intentional non-performance, conduct, and misrepresentations described in this Complaint, Capital has suffered damages, including, but not limited to, the amount of the Financial Fee, lost business opportunities, the impairment of Capital's interests in executed contracts, damaged business relationships, damaged reputation and goodwill, expenses of litigation (including attorneys' fees), and other amounts to be proven at trial.  In addition, Capital potentially has legal exposure to third parties as a result of PGT's intentional non-performance, conduct, and misrepresentations.

205.   Accordingly, under the Indemnification Clause of the Purchase Agreement, PGT must indemnify Capital for the damages Capital suffered as a result of PGT's failure to perform its obligations under the Purchase Agreement, including the attorneys' fees and costs Capital incurs in this action.

I.    **Cause of Action No. 9: Breach of Escrow Agreement (Baker and Kanetkar).**

206.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

207.   The Escrow Agreement is a valid and enforceable contract to which Kanetkar, Baker, and Capital mutually assented.

208.   Under Section 2 of the Escrow Agreement, Baker agreed to refund the Financial Fee to Capital if Baker failed to perform any provision of the Purchase Agreement or Escrow Agreement, "such as failure to deliver the SBLC via MT-760 to the agreed client designated account in a timely fashion [under the Purchase Agreement]." (Exh. No. 2, Escrow Agreement, § 2, p. 1.)

209.   In the event of such non-performance, Kanetkar was required to "immediately initiate collection procedures on behalf of [Capital] and facilitate the return of [Capital's Financial Fee] at the full expense of [Baker]. (Exh. No. 2, Escrow Agreement, § 2, p. 1.)

210.   Baker has indisputably failed to perform any provision of the Purchase Agreement and specifically failed to deliver the SBLC through the S.W.I.F.T. MT-760 process to SRG by October 26, 2016.   Despite multiple demands from Capital that Baker return the Financial Fee, Baker steadfastly refused to return the Financial Fee.

56

211.   Likewise, Kanetkar was required to retrieve and return the escrow funds upon notice of PGT and Baker's non-performance.   Kanetkar, however, overtly refused to put forth a good faith effort to retrieve and return the funds despite multiple demands from Capital.

212.   Accordingly, Baker and Kanetkar breached the escrow agreement and Capital has incurred monetary damages as a direct and proximate cause of their breaches.

213.   Capital is therefore entitled to a refund of the $565,000 (less any amounts previously refunded) that was deposited in Kanetkar's escrow account.

214.   In addition, Baker and Kanetkar have acted in bad faith, been stubbornly litigious, and caused Capital unnecessary trouble and expense during the entire course of events described in this Complaint.   Accordingly, Baker and Kanetkar are liable for Capital's expenses of litigation, including attorneys' fees, under O.C.G.A. § 13-6-11.

**J.   Cause of Action No. 10: Breach of Fiduciary Duty (Kanetkar).**

215.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

216.   Kanetkar, as Capital's attorney, had a fiduciary obligation to act in the best interests of Capital throughout the SBLC Deal.

217.   Kanetkar also voluntarily undertook to serve as Capital's escrow agent with respect to administering the Escrow Agreement and managing the funds paid into the escrow account.   As such, Kanetkar served as the trustee of those funds.   Kanetkar, therefore, had a fiduciary responsibility to Capital to protect the funds in the escrow account.

218.   Kanetkar breached his fiduciary duty to Capital by: (i) releasing the funds when the release authorization was procured pursuant to a fraudulent scheme of which Kanetkar was aware; (ii) failing to ensure that the escrow funds were not disbursed until the transaction was fully consummated; (iii) expressly refusing to discuss the improper release of escrow funds with Capital; (iv) disclosing to Baker the substance of confidential communications with Capital; and (v) failing to take all reasonable steps in a good faith attempt to retrieve the funds from PGT and Baker.

219.   Kanetkar's breach of fiduciary duty caused Capital monetary damages, including, but not limited to, the amount of the amount of the Financial Fee, lost business opportunities, the impairment of Capital's interests in executed contracts, damaged business relationships, damaged reputation and goodwill, expenses of litigation (including attorneys' fees), and other amounts to be proven at trial.

220.   Kanetkar has acted in bad faith, been stubbornly litigious, and caused Capital unnecessary trouble and expense during the entire course of events described in this Complaint.   Accordingly, Kanetkar is liable for Capital's expenses of litigation, including attorneys' fees, under O.C.G.A. § 13-6-11.

221.   While breaching his fiduciary duty to Capital, Kanetkar exhibited willful misconduct, malice, fraud, wantonness, oppression, and such an entire want of care that the presumption is raised that Kanetkar possessed a conscious indifference to the consequences of his conduct.   In addition, Kanetkar's actions establish that he acted with specific intent to harm Capital.   Accordingly, Kanetkar is liable to Capital for punitive damages under O.C.G.A. § 51-12-5.1, the amount of which is for the jury to decide.

### K.   Cause of Action No. 11: Breach of Settlement Agreement (PGT and Baker).

222.   Plaintiff incorporates by reference the previous allegations of the Complaint as though fully set forth herein.

223.   The Settlement Agreement is a valid and enforceable contract to which PGT, Baker, and Capital mutually assented.

224.   Under the Settlement Agreement, PGT and Baker agreed to pay Capital $561,000 in one lump sum representing the Financial Fee on or before January 30, 2017.  (Exh. No. 4, Settlement Agreement, § 1, p. 2.)

59

225.   PGT and Baker breached the terms of the Settlement Agreement, because, to date, neither PGT nor Baker have made any payment in accordance with the Settlement Agreement.

226.   Consequently, Capital has suffered a liquidated amount of damages in the amount of $561,000 as a result of PGT and Baker's breach of the Settlement Agreement.

227.   Because PGT and Baker agreed to be jointly and severally liable for the payment, (Exh. No. 4, Settlement Agreement, § 1, p. 2), Capital is entitled to a judgment against both PGT and Baker for the full amount owned under the Settlement Agreement.

228.   In addition, Capital is entitled to an award of its expenses of litigation, including attorneys' fees under the Settlement Agreement and O.C.G.A. § 13-6-11.

229.   First, the Settlement Agreement provides:

**<u>Attorneys' Fees and Costs</u>**.  Each Party agrees to bear its or his own fees, costs, and expenses relating to and incurred in connection with this [Settlement] Agreement; provided, however, that in any subsequent litigation or other proceeding to enforce the terms of this Agreement, whether initiated by Capital, Bautista, Prestige, or Baker, the prevailing Party shall be entitled to recover its or his reasonable feeds and costs from the other Party or Parties, including but not limited to, attorneys' fees and costs, expert witness fees and costs, and court costs.

(Exh. No. 4, Settlement Agreement, § 7, p. 3.)   Accordingly, PGT is liable for Capital's expenses of litigation, including attorneys' fees, under the Settlement Agreement.

230.   PGT and Baker have also acted in bad faith, been stubbornly litigious, and caused Capital unnecessary trouble and expense during the entire course of events described in this Complaint.   Accordingly, PGT and Baker are liable for Capital's expenses of litigation, including attorneys' fees, under O.C.G.A. § 13-6-11.

## VII.  **DEMAND FOR JURY TRIAL.**

231.   Capital hereby demands a trial by a jury of twelve as to all issues in this Complaint so triable.

## VIII.  **PRAYER FOR RELIEF.**

WHEREFORE, Capital prays for judgment against PGT, Baker, Kanetkar and GII, and, specifically, that this Court:

- enter judgment against Defendants on Cause of Action No. 1 including actual damages, treble damages, and attorneys' fees;

- enter judgment against Defendants on Cause of Action No. 2 including actual damages, treble damages, and attorneys' fees;

- enter judgment on Cause of Action No. 3 in favor of Capital and against PGT declaring the Purchase Agreement was fraudulently induced, the Purchase Agreement is void and unenforceable, and Capital definitively and timely rescinded and repudiated the Purchase Agreement;

- enter judgment on Cause of Action No. 4 in favor of Capital and against Baker and Kanetkar declaring the Escrow Agreement was fraudulently induced, the Escrow Agreement is void and unenforceable, and Capital definitively and timely rescinded and repudiated the Escrow Agreement;

- enter judgment on Cause of Action No. 5 awarding damages (including punitive damages, interest, penalties, costs, expenses, and attorneys' fees) to Capital and against Defendants in an amount to be proven at trial for Defendants' fraudulent conduct;

- enter judgment on Cause of Action No. 6 against Defendants requiring them to refund the full amount of the Financial Fee (with interest, penalties, costs, expenses, and attorneys' fees) to Capital;

- enter judgment on Cause of Action No. 7 against PGT and award damages (with interest, penalties, costs, expenses, and attorneys' fees) to Capital for PGT's breach of the Purchase Agreement in an amount to be proven at trial;

- enter judgment on Cause of Action No. 8 against PGT and award damages (with interest, penalties, costs, expenses, and attorneys' fees) to Capital for PGT's intentional non-performance, conduct, and misrepresentations in an amount to be proven at trial;

- enter judgment on Cause of Action No. 9 against Baker and Kanetkar and award damages (plus interest, penalties, costs, expenses, and attorneys' fees) to Capital for Baker and Kanetkar's breach of the Escrow Agreement;

- enter judgment on Cause of Action No. 10 awarding damages (including punitive damages, interest, penalties, costs, expenses, and attorneys' fees) to Capital and against Kanetkar in an amount to be proven at trial for Kanetkar's breach of fiduciary duty;

- enter judgment on Cause of Action No. 11 against PGT and Baker and award $561,000 (plus interest, penalties, costs, expenses, and attorneys' fees) to Capital for PGT and Baker's breach of the Settlement Agreement; and

- award Capital such other and further relief as is just and proper.

Respectfully submitted this 27th day of February 2017.

**BAKER & HOSTETLER LLP**
*Counsel for Capital Consulting, LLC*

*/s/ S. Derek Bauer*
S. Derek Bauer
Georgia Bar No. 042537
dbauer@bakerlaw.com
Ian K. Byrnside
Georgia Bar No. 167521
ibyrnside@bakerlaw.com
Cody S. Wigington
Georgia Bar No. 653519
cwigington@bakerlaw.com

1170 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia 30309-7676
404.459.0050 (telephone)
404.459.5734 (facsimile)

**Complaint**, *Capital Consulting, LLC v. Prestige Global Trading, Ltd., Peter Baker, Jayat Pramod Kanetkar, and Guaranteed Investigations, Inc.*, U.S. District Court for the Northern District of Georgia, Atlanta Division (February 27, 2017)